15-1177 PHH Corporation v. CFPB Mr. Olson for Petitioners, Mr. Mopan for Amicus Curiae United States of America, Mr. DeMille-Waddington for the Respondent Mr. Olson, good morning. Thank you, Your Honor, and may it please the Court. The issue before the Court today was considered and decided by our Founders on three separate occasions in 1787, 1788, and 1789 by a vote of seven states to three at the Constitutional Convention, again as a key part of the ratification debates the very next year, and yet again during the very first Congress. On each occasion, the Founders voted for a single individual rather than a plurality in the Presidency, as the structure best calculated to ensure a strong, vigorous, and accountable executive. Article II could not be clearer. The President alone shall take care that the laws be faithfully executed. That obligation, according to James Madison and the Supreme Court just seven years ago in free enterprise funds, empowers the President to keep executive branch officers accountable by holding them and having the power to remove them from office. Mr. Olson, didn't that all chose with Humphrey's executor? Pardon me? Didn't that all chose with Humphrey's executor? The case that I just quoted is free enterprise fund. That is many years later than Humphrey's executor. And what free enterprise fund did is make it clear that there have been exceptions, which the Court determined not to revisit in free enterprise fund, but that there have been exceptions under certain narrow circumstances. Humphrey's executor is one of them. The Morrison v. Olson case is another, but that experiments by Congress in taking power away from the President, diminishing powers of the Presidency, are limited to those exceptions. And what's the power of the Presidency that is uniquely diminished in this instance? Humphrey's executor recognized a significant diminishment in power by injecting the full class of labor. How is this any worse than that? Humphrey's executor decided in 1935 to examine an agency that was described by the Supreme Court in that case as having limited jurisdiction, exercising quasi-legislative and quasi-judicial powers. It didn't have the powers that the FCC subsequently had to enforce the law. But in Morrison, that was later described as executive power. The distinction that Humphrey's executor was making between quasi-legislative and quasi-judicial, there was executive power. There's very little distinction between the power exercised by the FTC in Humphrey's executor and the power being exercised here. They're both executive. Well, at the time the Supreme Court examined the FTC in 1935, it had limited powers. It's been given more powers subsequent to that. And you're right, in the Morrison case, that was clearly executive power. But it was an inferior officer with limited tenure, with a limited scope of jurisdiction. And what Free Enterprise Fund says is that we are going to limit intrusions by the legislature on the principal, exclusive power of the president to be accountable, hopefully to execute the laws. So those limited exceptions... What I'm asking is how is this different in terms of diminishing the power of the president? How is this different in Humphrey's executor? This agency goes further than anything Congress has ever attempted to do in history. But I'm speaking to the power of the agency. I'm speaking to the power of the president. How is the president's power any further diminished in this case than it was in Humphrey's executor? The same removal. The Congress itself understood and recognized that it was going further than it was ever been before. In limiting the president's power? In limiting the president's power in the following ways. First of all, the removal of power is limited. It's a single person. It's all vested in one person, as opposed to being distributed to several people, some of which would be appointed by... You might have strengthened the president's power. If you only have to get rid of one person to reshape an agency, that's supposed to be strengthened. What that debate in 1787 focuses us on is that when you concentrate power in one individual, you have a concentration of power. Humphrey's executor recognized, and this court recognized in the panel decision, that you disperse the power among five individuals. The power in this bureau, the director of this bureau, can hold office for five years. He can't be replaced by the president without the permission of the Senate. A holdover stays there as long as possible. Congressional authority... That's different from how all the other independent agencies operate, right? Because they all have, I thought in your brief you say, they all have multiple members with staggered terms, as well as the president's ability to designate a chair in most of those independent agencies. And so we have a real-time example. The FTC, the FCC, the SEC, the NLRB, the FERC, all within a week of the inauguration, the chair was redesignated. Well, that's absolutely right. That can't happen here. It's important here, in answer to your question, Judge Griffith, and to put this agency in context. Congressional power with respect to appropriations is removed. The power to appoint every single person in the agency without controlling, without the Senate involvement is invested in the director. The director has restricted by statute from even communicating with the president. Well, you're right, but I don't think it's answering my question. How does that further diminish the president's removal power? Something to say is that all of these statutes, one of which takes the power of the president to control what the director says with respect to pending legislation, with respect to interpreting statutes, with respect to the power that's vested in OMB by the president, with respect to looking at regulations and controlling what happens, the statute specifically says the exclusive power to interpret statutes, to decide what to prosecute, is in this director. I thought the major argument had to do with the number of the directors, that somehow there's a constitutional flaw here because we only have one director who can be removed as opposed to three. With respect, Judge Griffith, that is not at all the compact that was created by Congress with respect to this agency. It gave this director one individual, and that goes to your point, but that's not the only thing. This individual is given by a series of statutes, all of which were intended by Congress, to make this agency completely independent of the president and completely unaccountable to the president, so that the president, under free enterprise fund, the test is. That just doesn't make sense to me. First of all, Chief Justice Roberts said in free enterprise that the diffusion of power diffuses accountability, so having one person is more accountable than having three or five. And secondly, it's not as though there's no accountability. Even for appropriations, the director has to go every year before different committees and testify and justify the expenditures that are done, and I don't even understand what the argument you're making about the budget source has to do with diminishing the president's power. It's the accumulation of power, Judge Millett, and this agency does not have to go. Most banking agencies do not have annually appropriated budgets. Is that correct? Executive agencies have to deal with the opportunity. Do most banking regulatory agencies have annual appropriations, or do they have self-funding mechanisms? Each of them are different. The Fed, for example, doesn't have to go because it has a separate way of appropriating, so each one is different. This director is more accountable than, say, the Federal Reserve Board or a number of other regulatory controllers. How is this director accountable to anyone? If the president wishes to say so, anything that this bureau does, if the president wishes to say so, don't look at me. So that's an attack on all independent agencies. If you say for-cause removal gets you there, that means we have to, which we can't do. That is a serious problem. But assuming we can't do that, and I know you preserve your arguments for another forum, we can't do that, then isn't the fact that the president can replace this frequency, each president is going to be, not 100 percent, but most presidents are going to get to replace this person when they've got only a five-year term. And for-cause can be found on this individual, and they can be removed. So that's no different than this. And what's worse in Humphreys, exactly when you have these multi-member ones, is many of them specify that there have to be so many people from each party. So isn't it a worse intrusion on presidential power to say that, okay, it's a rotating membership, you get to make an appointment, but you have to appoint somebody from the opposite party. You don't have that here. When the bureau director slot comes open, as it will next year, the president has more authority and more discretion than the FTC, right? Actually, if this term ends next year, with respect to this director, but unless the Senate decides to approve the presidential appointment, this director can serve another 10 or 15 years. But a number of other judges do that, too. The panel decision in this case talked about the various ways in which a multi-person body, such as the Federal Trade Commission and the other commissions that we all know about, have to diffuse power because they have to talk to one another. There are individual staggered appointments over time, so the president has input over a period of time.  There's responsibility for individuals to talk to one another before making decisions. I understand the principle that restricting the president's removal power is a very serious intrusion on Article II power. We object to that. We would make that point here, except that, as you point out, this court can't change Humphrey's executor. But we wish it could. Also, Mr. Olson, can't change Morrison v. Olson. In Morrison was a single forecast official. Now, you say that it's different because the independent counsel's authority was limited and narrow, right?  But the court itself in Morrison analogized the independent counsel to administrative agencies like the FTC, which have civil enforcement power, just like this one. It said it was just like the FTC. And in terms of its power, I mean, what could be more powerful than an independent counsel who can indict the highest officials of the president's cabinet? That is correct. And that was executive power. Right. And it was the jurisdiction of the independent counsel. It's much more powerful than the Bureau. It's much more powerful. In terms of its ability, the independent counsel's ability to obtain the power of the president, which is the critical question here, right? That's the question we have to ask. The independent counsel was much more threatening to the president of the United States than the U.S. Bureau. Well, Judge Tatel, we submit, we object to restricting the president's power faithfully to execute the laws. That was a problem in the independent counsel statute. It was a problem with the FTC. But what the Supreme Court said in Free Enterprise Fund is whatever the flaws with respect to those or whatever the limitations with respect to those decisions, they're not before us because the parties did not ask us to look at them. But we're an appeals court. We're bound by Supreme Court precedent, including Morrison v. Wilson. And I just, I have not seen an argument in your brief, even if I agree with you, that there's a serious risk from the foreclosed removal provision for this director. Even if I agreed with you, I don't see how, as a judge on an appeals court bound by Morrison and Winfrey's, that I can go there. I just don't. I don't see where this court gets that flexibility. That's right. And so I understand the point. And I understand the restriction that we're faced with because this is an intermediate appellate court. So what it comes down to is unless you say this decision is dictated by Humphrey's executor and Morrison, in the Morrison case, and everything that this director is given, this agency is given, all this power is subsumed and just like and no further than Humphrey's executor or Morrison, then we're bound by that. It'll have to be decided by the Supreme Court. Excuse me. I haven't heard from you yet an argument for how I can conclude that we're not bound by that. The only thing I say in my brief is that the independent counsel was limited in tenure. Tenure limited and a focused power. And was an inferior officer. An inferior officer of the United States. Right. And had a limited tenure with respect to one investigation. Investigation was, but Dan, the question is, we have to ask the question, what is the effect, to what extent does it impair the power of the president to see that the laws are facing an executor? That's the question. It doesn't make any difference how long the tenure is. But in that case, the independent counsel had the ability to indict and prosecute the highest officials of the president's government. I mean, I can't imagine anything that would more significantly impair the power of the president than that. Like the court said, that was okay. I submit to you that the limitation of the narrow limitation with respect to the powers of that independent counsel, and I understand the power to indict is a serious power, which the CFPB doesn't have, although the CFPB does have the power to impose penalties of $10 million per violation, and that is a serious problem. The powers that are given to the CFPB, this bill is criminal justice. You keep saying it's serious, but the question isn't how serious it is, it's how seriously it limits the president's power. That's the question. I'll put it this way, because I think that you have to look at the broad powers that are given to this agency and decide whether they are only within the scope of Humphrey's executor or Morrison. The Supreme Court was very serious 70 years ago when it said, we're not going any further than that, and any further experimentation has to be looked at very carefully in the context of history, and this agency has more powers with respect to Humphrey's. Three things. We here are analyzing, I think, correct me if I'm wrong, the contours of the Humphrey's exception, as you would describe it, or the contours of Humphrey's. You don't even have to use the word exception, or the contours of Humphrey's. And I wouldn't agree with you about an exception. And so the Free Enterprise Fund says, I think, look at history, what's the historical roots for something like this. Look at the effect on individuals who are regulated. We talked about that a lot in the panel decision. And look at, as Judge Tatel says, the effect on presidential power. In other words, is there a further diminishment of presidential power beyond that already effectuated by Humphrey's executor? And Free Enterprise Fund said, yeah, it's maybe arithmetic, maybe it's minor, but it's further diminishment of presidential power than Humphrey's executor alone. And here the question, it seems to me, is what's the further diminishment of presidential power that Judge Tatel is asking? What's the further diminishment? And this is more a comment, and you can respond to it than a question, but it seems we have to compare it to how the multi-member agencies operate. And on presidential control in the multi-member agencies, they turn over quickly with a new president. So the president gets to designate the chair. We've seen that with all the independent agencies. The multi-members, multiple members meet staggered terms. And this does not turn over quickly. And the question is, does that matter? I think that the question Judge Tatel is asking. I'm trying to. And that does answer the question as far as it goes. But the statute went further than that. It limited the president's ability to control or have anything to do with communications with Congress. It took away any power with respect to the budget and the process of appropriation. It took away power from the president to have anything to do with the appropriations. I'm going to get to more specific. If you look at the FCC today, that's the issue we're describing here is not going on with the FCC or the FTC or the FERC or the SEC or the NRB, you go down the list. And why is that? It's because the way Congress has historically structured these independent agencies, these multi-member independent agencies, is that there's, as all the studies and all the academics have shown, there's quick turnover at a new administration. This one will not. In fact, after the 2020, after this next appointment, it will go to the third year of the next president. And if there's an appointment in 2023, it's going to go to the fourth year of the next president. With that president, who might have run on a platform of consumer protection, having to live with President Trump's appointee as consumer protection. That's precisely the point. Here's the question. Does that matter? Does the kind of dead hand of the past president in controlling the agency, which we don't have with FCC, FTC, does that matter? It does matter. It's both here and now, the restriction and diminishment of the president's power and its diminishment of the president's power in the future. The points that you're making are absolutely correct. But, Mr. Olson, do you think that staggering tariffs are constitutionally required then? What the court, I think, is saying in free enterprise funds is if it is not narrowly constrained to Humphrey's executor and Morrison, that is But it seems like it has to be narrowly constrained in a way that matters with respect to the diminishment of presidential power. And on that question, I'm not quite sure I understand the distinction between a situation in which you can remove, where the president can remove 100% of the principal officers, i.e. the one person. He can't remove the But some presidents can. I get that it's five years, so there's an 80% chance if I'm doing the math right that one president will have the opportunity. I don't know. My dad is a math tester. I'm not. My question is this, that if you have a fairly robust authority to remove the one person there, not every president is going to get to do it. I agree with you on that. But some presidents are. And you compare it to a situation in which there's multiple members, and there's a greater likelihood that each president can remove one, but perhaps, depending on the terms, a lesser likelihood that each president can remove a majority. Then aren't we at kind of a wash? Well, if you hold everything else constant, if you hold everything else constant, and I think I could construct a mathematical formula in a way that would do this, then the only difference is you remove one person and that's everybody, or you remove one to two and that may or may not be a majority. Is there really a difference there in terms of I believe that what the Supreme Court said in Free Enterprise Fund is that the baseline, what was decided in 1787, 88, and 89, is the baseline is the president can't be accountable if he doesn't have the power to remove. Congress has decided to restrict the power to remove, has created an individual that a president can appoint for five years. The Federal Reserve Board goes down under your view, the Federal Reserve Board, because of 14-year terms, and I guess there's seven members. So no president has the authority to appoint a majority, therefore to control, and therefore to have his policy preferences reflected. The chairman does not. I understand that. All right. But the member of the board, I mean, they don't have presidential control. And my understanding is because there's a pattern in the financial regulatory agencies of actually wanting to have some amount of separation. And as I take it, it's consistent with the Constitution and with the executive's authority to take care that the laws be faithfully executed, to have those people removable for inefficiency, for, you know, malfeasance in office, neglect of duty, but not have them removable because the president disagrees as a policy matter. So it's trying to avoid financial cronyism in favor of faithful execution of the laws. And you're saying that that's out of bounds. That is out of bounds. We elected a unitary president. I went back through the debates between June 1 and June 4, 1787. This was debated then, and the vote was seven to three, because execution of the laws isn't just enforcement of the laws, inviting someone. It is policy decisions with respect to how those laws are enforced. It's July 2018, and the president has the ability to replace the director of this bureau with anyone he wants for a nomination, has the ability to do that. Yes, there's Senate confirmation. That happens often. And let's imagine that a Democratic seat opens up on the FTC commission, and the president gets to fill that one, but by statute has to appoint someone from the Democratic Party. That's in the statute that was upheld in that case. My question to you is which is the greater intrusion on presidential power, the replacement of someone of your choice for the bureau or forcing the president to appoint someone of another party for the commission? In the first place, on that date that you referred to, the president may or may not be able to appoint a new director of this bureau. If he does not leave, if the Senate does not give permission to the person that he decides to nominate, that person may be there for several years. That's the same for the Federal Reserve Board and a number of other agencies, but I do want to get back to my question, which is put all that aside. I'm just asking you, when the president's exercising this power of appointment, which is the greater intrusion, appointing the bureau director for anyone he chooses or appointing someone from another party? If you take as the word the decisions that were made that I was talking about and the decisions that were reaffirmed seven years ago by the United States Supreme Court, yes, the power of appointment is extremely important, but the court goes on to say that it is the power that can remove, Okay, the power to remove is the same for the FTC commissioners and the director of the bureau, so I guess I'm wondering why you're not answering my question. I'll try a more leading question. Would you agree that the president has more of the essential appointment power in replacing the director of the bureau than replacing a member of the commission who has to be by statute from another party? A particular president at a particular point in time under the right circumstances may have more power with respect to that individual. The next president may not, because that president goes over for five years. That power may not be there. And I'd like to reserve the remainder of my time for a follow-up. I have just one quick question. To return to my perspective from the perch of a lonely appeals court judge, this debate about the difference between multi-member agencies and a single member is fascinating, but I don't understand how we can take account of that, given that Morrison not only upheld a full cost provision for a single-headed agency, but said it exercises powers analogous to the FTC. In other words, you know, you need to go back to the Supreme Court, I think, and say, wait a minute, you need to take a more careful look at this. These single-headed agencies are very, very different, but from where we sit, Mr. Olson, I just don't see how we can go beyond what the court has now set. What is the answer to that? I would say, well, I can only answer that. I'm sure I agree with you. If you feel, if you conclude that this goes no further than members of the Executive and Morrison versus Olson, then the next step is the Supreme Court. But I submit, this agency, given its collective powers, one individual who can appoint everybody, doesn't have to go to the President or subordinate officers, can hire and fire people, that is a power that is nowhere else in the federal government or very, very limited places. If you take this, answer it this way, Judge Tatel, if the powers that are given to the EPA and to the Treasury Department and to the antitrust agencies and so forth, all are vested in one individual, this director, why not? If it can be done with him, it can be done with other people, and then what is left of the Executive power? And I'd like to reserve the balance of my time. All right. Thank you. Mr. Mupant. May it please the Court. Judge Griffith, your observation at the outset of the argument that the functions that the FTC performed are executive in nature is a critical observation because what it tells us is that the rationale of Humphrey's Executive cannot be based on the functions of the FTC. It must be based on something else. And we would submit that what that something else is is the structural features of the FTC. And that is because what the Court was concerned about was that multi-member bodies. But the Court never framed its analysis in those terms, right? This is where we're going back trying to read into it. But they never made these arguments about the distinction between multi-member and single. I don't think that's a fair reading of the entire opinion, Your Honor. I think if you read the entire opinion, not just the section that discusses the constitutional analysis, but the section that talks about why Congress made this entity the way it was, the Court did emphasize that it was a multi-member body. Well, why would the Court have discussed that in a constitutional section if it was relevant? I mean, it's not there. Well, it is there, Your Honor. In a constitutional section? In two senses it is. The first sense is that if the opinion, that part of the opinion starts by saying it's an administrative body that has a certain function. And we think that when they're talking about it being an administrative body, part of what they're getting at is that it is a multi-member deliberative body. And at the end of that analysis, it ends by saying officers of this type, officers of this character. And what that has to be getting at is what the Court's rationale was, was that these are sort of different. That is an explanation. That is, that's the body they were dealing with. They happen to have in front of them a multi-member body. That's exactly right, Your Honor. And I think we should read the Supreme Court's cases based on the facts that were before them and not just wisely assume that those facts aren't relevant. Well, what is the constitutional provision at stake here? What provision of the Constitution are we looking at? It's Article II, Your Honor. And the point is that the executive... The removal power, right? Yes. The general rule is that principal executive officers must be removable by the president at will. Humphrey's executor recognized a narrow exception to that as Free Enterprise Fund emphasized. And the rationale of that exception has to be based on the structure. But how is your rule even correct under Free Enterprise? Because in Free Enterprise, the Supreme Court assumed for the sake of the argument that SEC commissioners were protected by the Humphrey's executor good cause provisions. The Supreme Court also held that that was sufficient control of the president over SEC commissioners who indirectly then gave the president sufficient control over the PCOB. So if there was an exception that was created, it wasn't just for... It was at least recognized, again, in Free Enterprise Fund. The SEC, like the SEC, is a multi-member body. And so the rationale of it being limited to the sort of deliberative bodies that could credibly be characterized, at least by the Supreme Court in 1935, as quasi-legislative, we're not taking issue with that in this court. And this court, of course, can't revisit Humphrey's. But what we are suggesting is if you don't adhere to that structural feature, there is no limiting principle to Humphrey's. As Judge Griffith noted, these functions, the functions that the SEC had and the functions that the CFPB have are the exact same functions that the Secretary of the Treasury had. But what do we do with Morrison v. Olson as an inferior court? We're bound by Morrison, correct? So I think the answer is... So you're saying we're bound by Morrison? Yes, you are, Your Honor. And the key to Morrison v. Olson is that that case did not involve principal officers. It involved inferior officers. And when you look at Free Enterprise Fund, that is exactly how Free Enterprise Fund described the cases. It starts by talking about the general rule under Article II in Myers. It says that Humphrey's executor is an exception for principal officers. And then it turns to inferior officers and talks about Perkins and Morrison. Humphrey's Free Enterprise Fund precludes reading Morrison as a sweeping exception that would apply to principal officers. And again, Your Honor, if it were otherwise, the logic of the CFPB's position necessarily suggests that there could be a four-cause restriction for the Secretary of the Treasury or the Secretary of the Labor Department or the Secretary of Health and Human Services because all of them perform the exact same types of functions. And I just don't think anyone has ever read Humphrey's executions. Is the SEC commissioner a principal officer? I'm sorry? Is an SEC commissioner a principal officer? Yes, they are, Your Honor. So Free Enterprise Fund recognized that Humphrey's executor protections could apply to principal officers there? Yes. The sole exception that the Supreme Court has ever recognized for a four-cause restriction for a principal officer is the Humphrey's executor exception. And the key we submit to that exception is that it is a multi-member regulation. I just don't understand the government's position. So you're focusing on the multi-member composition of the agency. So your view is that the switch between multi-member and single director does all the work. And it does all the work in the sense that the switch from a multi-member agency to a single director agency diminishes presidential power. It has to, right, under your view? Two points, Your Honor. Yes, it does, but also it doesn't matter. And they're flip sides of the same coin. The key is that the Humphrey's executor is already a significant intrusion on presidential power, but it had a rationale. The rationale we submit had to be because it was quasi-legislative because of its structure. If that structure is not there, then the rationale for the exception doesn't obtain, and therefore the intrusion that Humphrey's executor already justifies is not justified. Suppose we don't agree with that. If you don't agree with that, the exception is not justified. Suppose you don't think that a multi-headed agency was critical in Humphrey. Then what? Then do you lose? Well, that is the basis. Our submission is based on the critical difference between the multi-member agency. But if we don't agree, then do you have a back-up argument? We have not submitted a back-up argument in this case, Your Honor. But if I could get back to the second half of my answer to Judge Trinomasin, it's that the switch between multi-member and single-entity agencies actually does diminish the president's power. In this respect, do you disagree with the panel opinion? That's not right. The panel opinion said this at 58. I didn't read the panel opinion to be taking a position one way or the other on the question. No, it did. On page 58 it said it diminished. The question misdescribed it. If I could explain why we think that there is a greater inclusion on the president's power from having a single entity. The quintessential hallmark of executive power is the ability to act with vigor and dispatch. The founders made that very clear repeatedly, and that's why they invested in a unitary executive. When you have a principal officer who can act with that vigor and dispatch, who can unilaterally make executive decisions across a whole swath of the economy, but then you remove the accountability, that is a critical intrusion on the president's power. And you could view it when you instead, on the other hand, have a deliberative body, a multi-member body. It might, to be sure, Judge Blatt, it's less accountable in a sense. But you could view it as less of an intrusion on the president's power because it's not the quintessential nature of vigor and dispatch that characterizes executive action. So it's less appointable, it's less removable, and, as you say, it's less accountable, less removable, and less appointable. And so that seems to me a problem, and to say that this thing is – you have to say this is worse than that. Well, so again, we have two different points. The first point is that the rationale for Humphreys just doesn't obtain here. So even if it's the same level of intrusion on the president's power, if the justification that was put forth in Humphreys doesn't obtain here, then that level of intrusion is not valid in this circumstance. And what happens to the Social Security Administrator? Your Honor, we haven't taken a position on that. That's the single head of a body that controls 24% of the national budget and probably a half to three-quarters of the American population. And so what I would say is that our position dictates that the Humphreys executive exception itself does not apply to the Social Security Administration. But that does not necessarily answer the question whether there might be some other exception which justifies that. What other exception? Much as in Free Enterprise Fund, the Supreme Court recognized that the double-four cause there was a problem, but it didn't purport to say it was adopting a rule for every double-four cause. It noted that many other agencies that have – or officers that have double-four cause, and despite Justice Breyer's objection that the court wasn't weighing in on each and every one of those, the court said it would take them one at a time as the cases came through. So how would we write an opinion here that would say that the Bureau, the director of the Bureau is constitutionally impermissible under Humphreys' executor, but in doing so would adopt a rule that would protect independent counsel, Social Security Administrators, and any other single head? So the key would be the first step of the analysis would be to say that the Humphreys' executive rationale itself doesn't obtain because it's a single-headed agency. And at that point, I think the next step would be to say nothing about the CFPB militates in favor of an exception because on every other metric it is a quintessential executive agency. It operates with a wide swath of jurisdiction, engaging in enforcement actions against private parties. Some of those factors are not implicated by Social Security, the Office of Special Counsel, and the others. We're not necessarily suggesting those decisions ultimately matter. We haven't taken a position on that, and they should be decided in a future case. But the decision in this case will not resolve that. All you need to do in this case is to recognize that once you take from a multi-member to a single entity, the CFPB director is just not distinguishable from the Secretary of the Treasury and the Secretary of Labor. And unless this court is prepared to say that Humphreys' executor means that a four-clause restriction is permissible for cabinet secretaries, a position that I don't think any fair reading of free enterprise fund or Morrison would lead to. But that's not in any statute. No statute says that cabinet secretaries have Humphreys' executor. That's right, Your Honor. But if the CFPB's position prevails in this case, it would be a green light for Congress to do that tomorrow. The postmaster general used to be a member of the cabinet, and then Congress changed that, and is now removable under a four-clause standard. Sorry, I didn't hear you. The postmaster general used to be a member of the cabinet, and then Congress changed its status. So it can't just be that you look and say this looks like something a cabinet member might do, and therefore you can't do it. And you're not defending that either. I'm not sure about the current structure of the postmaster general, Your Honor, but I would say that I don't think any fair reading of free enterprise fund or even Morrison would suggest that a four-clause restriction on the secretary of the treasury is consistent with Article II or Myers. Certainly Humphreys' executor didn't suggest that, and no one has ever understood it to be that way. So on history generally, one of the things we have to take account of, the free enterprise fund tells us it's the history. And obviously that's one of the things we focused on at the panel level. And the question I think that some of the questions raise is, is that history where Congress has always done it multi-member with, you know, one or two exceptions for a hundred years, was that an accident or was there a reason that Congress did it? And, you know, what do you think? Because you've gotten a lot of questions about there's really no difference, but if there's really no difference, why was this repeated over and over again? That's exactly right, Your Honor. I think the reason why it was repeated over and over again is, as some of the reports that we cited in our brief and that the panel opinion cited, the notion of an independent agency was inextricably bound together with the idea that it was this permanent deliberative body. That is why, again and again. Why do you think that was? Because it could be a permanent deliberative body of one. Well, I think, Your Honor, because a single individual can act with the sort of quintessential vigor and dispatch that characterizes an executive agency and principal officers, and the idea that that was permissible is a radically different notion than the idea that you could have a multi-member body that lacks the vigor and dispatch of the executive. Is that the issue here? I thought that the problem here is that Congress took away from the President the authority to enforce a whole range of statutes, right, and put it in someone who could only be terminated for cause. That's the trenching upon the President's power, not whether the agency is run by one or five or ten. The crime, that's not the right word, but the trenching occurred when Congress took away from the President the authority to enforce these statutes, right? I agree with you, Your Honor, but the question is why in Humphrey's executive, the Supreme Court upheld that limitation, and all I'm suggesting is that if you read the opinion as a whole, it cannot be based on the functions, because as Your Honor suggested, those functions are quintessentially executive. And so the only rationale that makes sense, and it is a rationale that's borne out if you read the opinion as a whole in terms of why Congress created this agency, is because it was a multi-member body that functioned in a deliberate fashion. That was based on a notion to pick up on Judge Tatel and Judge Griffith's questions. I think that was based on a notion if you read Humphrey's, and it's an odd notion from today's perspective, but this idea that we're creating a quasi-legislature, kind of a mini-legislature, and also a mini-appellate court, as well as having some law enforcement functions, right? So all in one, so when you think about a legislature, multiple people, appellate court, multiple people. But then Morrison dropkicks that rationale, and that's no longer the governing rationale. And the question is, does the vision, Justice Sutherland's odd vision of the quasi-legislature, quasi-appellate court, still carry through after Morrison, and why should it? Well, because Free Enterprise Fund says it does, Your Honor. If you read the way Free Enterprise Fund discusses the case law, when it discusses Humphrey, it revives the quasi-legislative, quasi-judicial distinction as the rationale of Humphrey's, and it relegates Morrison to it as a case about inferior officers. It does not suggest that Morrison is a free-floating test that says that even for principal officers We wouldn't have a legislature of one. That's unthinkable. We wouldn't have an appellate, we wouldn't have a Supreme Court. Imagine a Supreme Court of one. I don't think anyone would want that, depending on who it is. And that's what Humphrey's thought they were creating. But I think the problem that Judge Tittle's raising is that that rationale seemed to have submerged. What you're saying is Free Enterprise Fund redrew that line. I'm saying two things. One is that Free Enterprise Fund did redraw that line, and the second is that if Free Enterprise Fund didn't draw that line, it would necessarily lead to the problem of does this mean that Humphrey's executor, unknown to everyone until today, means that you can impose four-clause restrictions on cabinet officers. Core executive function, even Morrison, says that even in the context of inferior officers, that there are certain officials who can't be subject to four-clause restrictions, and I would have thought it would be inconceivable that, for example, the Treasury Secretary can be subject to four-clause removal restriction. But CFPB has offered no limiting principle that wouldn't reach the Treasury Secretary, and that Zunighi not only conceded what, they openly embraced the notion of what. But also, isn't the idea of the cabinet officers that the president's control over them is what, he needs the cabinet officers so that he can take care that the law is faithfully executed, and the Treasury Secretary isn't an analog to the director of the CFPB, and to the extent that the Treasury Secretary is the person to whom the president turns for advice on trade policy, domestic policy, all kinds of things that the president constitutionally has to do, whereas here you have somebody whose charge is limited to carrying out anti-fraud statutes in the financial sector. And that's something where there's a charter, do these laws, do them impartially, carry them out effectively. If you're inefficient, if you fall down in that, I'm going to remove you, but go have at it. That's a very different kind of function, and it doesn't seem to me clear why that impinges on the take-care authority and responsibility of the executive. I don't think that's true for most cabinet secretaries, John. It might be true that certain cabinet secretaries implement the president's inherent Article II power, such as Secretary of State or Secretary of Defense, but the Labor Secretary or the Health and Human Services Secretary are not implementing any inherent Article II power. They're implementing Acts of Congress, no different than the Acts of Congress that the CFPB directors implement. Before you sit down, how does the exemption from the appropriations process play into your argument? We don't rely on that position, Your Honor. We think that the key here is that it's a multi-member agency, and it's not a multi-member agency, and therefore the rationale of Humphreys doesn't obtain, and there's a greater inclusion on the president's power because of that. I would agree with you, not that the exemption from the appropriations process, it doesn't deal with the executive, but it diminishes the constitutional function of Congress. I suppose that's right, Your Honor, but again, in terms of the Article II analysis, we're not relying on the exemption from budgetary. Why does your analogy have to be cabinet secretaries? I mean, I can see the argument that those are not the same, but it seems to me that the logic of what's going on here is that if you can have this single director who is only removable for cause, who takes under his purview a huge part of what clearly used to be the business of executive agencies, couldn't you just have four or five or six of those that take all of this thing by subject matter, right, and then you would end up with a nominal president and a bunch of single directors accountable to no one? That's exactly right, Your Honor, and let me just, with one final point, segue to the point that Judge Taylor made earlier because it's tied to that, which is it's true that intrusions on the president's officers in cases like Morrison do wound the president, but it's important to remember that the powers of the president are vested in him not just for his own sake, but for the people to ensure accountability to the people. Wiping out the president's ability to control an agency that regulates vast swaths of the economy is a much more serious intrusion on the president's executive power than whether any individual cabinet member can be prosecuted. Individual cabinet members can be replaced. The ability to regulate the entire economy, that can't be changed, and that's what the court was talking about in Morrison when it said it was limited tenure and limited jurisdiction. The cabinet's not a statutory concept, correct? That's correct. It's just a custom. That's right, and I take Judge Brown's point. Individual presidents can put people in and out, and do put people in and out of the cabinet based on lots of things. But the point of Judge Brown's question is the entire domestic policy of the United States could be put, and enforcement of all laws that are domestic, at least carving out, say, defense and state, could be put under one or more independent agency heads. That's absolutely right, Your Honor. I wasn't using the cabinet in any sort of structural sense. It's just a list of very important agencies that it's inconceivable that Humphrey's executive But I just wanted to clarify your point on that. Would your position be the same if instead of making the head of HHS removable for cause, they replaced the head of HHS with a three-member body removable for cause? That would be okay. Your concern here is replacement by single individuals. If Congress were to do that, it would fall within the rationale of Humphrey's executive, and I think then it would be much more likely that we would be heading to the Supreme Court to revisit Humphrey's executive. But I think it is no surprise that that is a hypothetical. Restructuring cabinet secretaries, especially the long-standing agencies, would be a dramatic step, whereas slapping a four-cause restriction on those agencies would be a lot easier to do, and it is notable that no one has ever tried to do that in the 70 or 80 years since Humphrey's executive. What about making the Department of Justice an independent agency? I doubt that that could be done, because I think the Department of Justice probably does implement at least some of the But the problem there, I think you would say, is not that it's multi-member versus single. It's that there are just some things, like Myers said, that have to be removable at will. So when we talk about the cabinet members, the problem there is more function, which is the line you don't want to draw, rather than you'd, I think, object as much to the multi-members as single. So it's possible, Your Honor, that courts could try to draw those lines, but it would be very difficult to do so precisely because, as Judge Rift noted at the outset, those functions are executive in nature. So then you would have to draw some sort of line about which functions are too big and which functions are not, and that is not the sort of bright line and clear distinctions that the Supreme Court has made clear are very important in separation of powers disputes, because they will be the only things that are judicially defensible in the heat of inter-branch conflict. Thank you very much. Judge Henderson, and may it please the Court. Before I forget, I'd like to address one point that was raised by PHH here, and that deals with the holdover provision in the Consumer Financial Protection Act. The Consumer Financial Protection Act gives the director a five-year term, and it provides that after that five-year term the director may hold over until a successor has been appointed and confirmed. But this Court explained in Swan v. Clinton, 1996 decision, 100-Fed-3rd-973, that where a statute permits an official to hold over, this Court will not infer that for cause removal protection applies during the holdover period unless the statute makes specific provision for that. And there is no provision for that in the Consumer Financial Protection Act. Is that the position the agency is removable at will when the term expires? That is our position, Your Honor, yes. So after his five-year term expires in July of next year, yes, he is removable at will by the President. Now, Judge Srinivasan, you raised the point about that the President may have more control over the head of the Bureau than he does over the five members of the Federal Trade Commission. And, in fact, we have done the math there. The Bureau, as you said, with respect to the Bureau, the President has an 80 percent chance, a four-fifth chance to have an opportunity, to be guaranteed an opportunity to replace the Bureau's director. With respect to the five members of the Federal Trade Commission who serve standard seven-year terms, it's a four-seventh chance that he is guaranteed an opportunity to replace a majority of the Board. That's 58 percent. The history and tradition and culture and law of independent agencies, and you know this very well, obviously, is that they turn over to control by the President's party either immediately, as happened when President Trump came in with almost all the independent agencies, or pretty quickly. And that is in part because of the staggered terms, in part because of the chair designation. So the FTC, like I said, the FCC, all of those have turned over and are now controlled by the party of the President. And that's been the practice, as I understand it, going way back. And that doesn't happen with this agency. And the question, I guess, I have is, doesn't that matter? Doesn't that matter? In other words, that there's a turnover in the others and not here. Turnover isn't guaranteed. And I'd like to point out that with respect to the FTC, at the time of Humpton's executor, the President could not I understand that. This came into being in the late 40s as a practice, as I understand it, and the turnover and the chair designation provisions. But since then, as I understand it, there's been a tradition. And that's why all those independent agencies quickly became headed by Trump-designated chairs within a week of the inauguration. That has not happened and cannot happen with the CFPB. And to my mind, that seems like if the question boils down to, okay, we have the history and we have the effect on liberty, but is there a real effect on the President, that seems like a further diminution of presidential authority, in other words, preventing that process that takes place at the other agencies. But I want your response to that because I know there are answers to that. My understanding, Your Honor, is that the President has no automatic authority to change the chairman of the Board of Governors of the Federal Reserve System. That term expires next February. And the agency that controls the monetary policy of the United States, and back to the mathematics, Judge Srinivasan, with respect to the Board of Governors of the Federal Reserve System, and as Judge Pillard noted, because there are seven members who serve staggered 14-year terms, the President is never guaranteed an opportunity, never guaranteed an opportunity to appoint a controlling majority. It's true that on occasion that positions may turn over and there may be vacancies. In the agencies, I agree the Fed is an interesting hybrid. In the agencies that are analogous to this one, there is historically the immediate turnover. Here's the problem. The last seven pages of Morrison v. Olson's dissent are very instructive on this because Justice Scalia there didn't just analyze all the history. He said, and here's what's going to happen. Here's what's going to happen. And he laid it out, and then the next ten years it was like he had written a script for what was going to happen. Then everyone realized, oh, this is a problem. And I want to try to put myself in those shoes and try to figure out what's going to happen. So President Trump appoints someone in 2018, July 2018. That person serves to July of 2023. The new president might be at a different party, might have run on a platform of consumer protection, might be the person who created the Consumer Protection Agency, and will not have the authority to do anything about that for three years, contra how he or she would be able to handle all these other independent agencies. And that's a reality. Now, let's say he goes two terms. Then it goes to 2028, and so the president comes in in 2024, can't, and might have run on a platform of consumer protection and all these, can't do it for four years until right before the 2028 election. And so I look at that reality and I say, that sounds crazy as a matter of constitutional text, history, structure, and common sense, frankly. And so why would we buy into a concept that's going to lead to this oddity that we've never had before? That's where the history plays into my thinking about this, too. We've never had this before, and boy, this seems to affect liberty, at least I think it does. It seems to diminish the president's power. But it leads to this bizarre situation where a key element of the president's platform, the president can't do anything about it. But that's no different with respect to other agencies where the president doesn't get an opportunity to oppose a controlling majority of those boards. It may be that with respect to the Federal Trade Commission. It may be, but the real, what we're living through, and so this is why this argument is timely as compared to a year ago. We just lived through a real-time example of how this works with the other agencies. And I've got the charts of all, you know, they've all almost all turned over or will turn over. Almost all of them did right in the first week of the presidency. And so that just gives me pause about the ramifications of this, because I think a lot of uniqueness when we're here in 2022 are going to say, oh, wait, we want that CFPB director who was appointed by President Trump, we want that person out. And all the positions are going to be like this. And that was Justice Scalia's wisdom and Morrison's to see how it would impact or have an effect in the future. And I think we need to think about those consequences. Your Honor, Humphrey's executor and Morrison v. Olson, the point they make is that what's crucial for the president is that the president, is that the officials be sufficiently accountable. The president's removal authority, those cases make clear, the president's removal authority is not illimitable. Let me give you a couple of questions on hypos just to see where this is going, besides the hypo I just gave, which is problematic, I think. Could Congress pass a statute saying the majority of the commissioners of an independent agency, a multi-member one, must be of the opposite party from the president? I don't know, Your Honor. I don't know whether the president could do that. The Congress. Could the Congress do that? Pass a statute saying the majority of the members of the independent agency must be of the opposite party from the president? I don't know, Your Honor. That issue has not been raised here. Let's take back to what's happened here. The other thing I think we have to be careful about, don't we, is history versus what statutes provide. A lot of people resign before their terms are up. And theory was to have these six-year terms in most of these agencies so you wouldn't get this automatic turnover. And at least during my lifetime, I've seen a lot of people resign early. So I don't think that history is quite as solid as is suggested in terms of the demunition of presidential power. And that's the issue here, isn't it? Let me ask you a different question. I'm sorry, do you want to respond to that? Do you have a response? Yes, Judge Rogers, I think the key here is whether and the issue that's been raised is whether, just as a matter of what it says in the Consumer Financial Protection Act, whether that act, the structure created by the act, not in terms of what happens, the Bureau's director could resign, but whether the act in and of itself is unconstitutional because of the way it's structured. Mr. Chairman, what is your response to the United States' assertion that if your position is correct, then Congress could choose to make Secretary of the Treasury removable only for cause? Your Honor, I don't have an answer to that question, and I don't think this court, in this case, needs to answer that question. For 130 years, Congress has created a wide variety of administrative agencies, structured somewhat differently, headed by sometimes three, sometimes five, sometimes seven or 11. But they've never done anything quite like this. Let me get you that from one sentence from the blue brief at 26 and see if you agree with this. Never before has so much federal power been concentrated in the hands of one person so thoroughly shielded of constitutional accountability. React to that. Is that true or not, and does it make a difference? It doesn't make a difference, Your Honor, because that's not the basis. But is it true? Is it true in terms of how much power the Bureau has? The Bureau, as I said, there's... No, not just the Bureau, the direct person of the Bureau. Is it true that never before has so much federal power been concentrated in the hands of one person so thoroughly shielded of constitutional accountability? I don't know, Your Honor, and I wouldn't like to speculate as to the power of the Chairman of the Federal Reserve Board, which is a very powerful position. How about if Congress passes a statute before the next appointment of the CFPB Director and says that the next CFPB Director will have a 30-year term? Is that constitutional? Your Honor, in the Shertleff case, the 1903 decision of the Supreme Court, the Court had to deal with a situation where there was no tenure limit whatsoever, and the Court held that that was problematic, that the President, therefore, could remove that official. It was an appraiser at will. No, it's no tenure limit. I'm talking about a term shortened to 20, if that makes it better, a 20-year term for the next CFPB Director whom the President will appoint in July of 2018. If Congress passes that, is that... I think the logic of your position is that's fine, anything goes. No, I wouldn't say that's the logic of my position. Okay, then what is the limit we could draw that would say a 20-year is too much? What would that be based on, history? Well, you don't like to look at history, so let's go with history. This Court, I do like to look at history. I'm trying to draw on the history here. That sounded worse than I meant it. No, no, no. What this Court has to deal with here is a Director who has a 5-year term. Federal Trade Commissioners serve 7-year terms. I'm not going to speculate as to whether if it were a 10-year term or if it were a 15-year term. You can draw me out. My point is simply I think there's no limit if you don't look at historical practice as at least some kind of an anchor here. And whose ox is going to get gored? You know, that's going to shift. No, Your Honor, the anchor here is that with all these agencies, all are different. No two are exactly the same. This question on the example of one person for 20 years, do you think if that's a problem, do you think it's a meaningfully different problem than another statute which says two persons for 20 years, non-staggered? I think it could be a different issue. Again, I don't know. We have one person here for five years. These two agencies, of all the agencies that the government has created, it's hard to see that two agencies are more similar than the Bureau and the Federal Trade Commission. And the Federal Trade Commission's forecast removal provision, which is virtually identical to the forecast removal provision in the Consumer Financial Protection Act, was upheld in the Humphrey's executor case. What the court has looked to is accountability and whether the president can take care that the laws be faithfully executed. And the court held that so long as the president could remove the official, at least for good cause, the president has sufficient authority. The court also warned us about novelty in this area, have a president. We're suspicious of significant changes. And this is a significant change, right? It's nothing quite like this. No two agencies are exactly alike. And the one versus five, one versus multi-member, was never a consideration in any of the Supreme Court cases discussing forecast removal. We haven't had a run before. This is the first run, right? But there's nothing. The Humphrey's executor case focused on the functions of the Federal Trade Commission with respect to its analysis of the constitutionality of forecast removal, not the agency structure. And there's no reason to believe that the president has less accountability over an agency that's headed by a single director as opposed to a multi-member. That's where the terms used in Humphrey's executor may be a clue about the structure. So they referred to it as quasi-legislative and quasi-judicial. And you look at the history, where do those terms come from? What were they thinking? They were thinking about independent agencies as essentially a combination of functions and would recreate in one group a legislature and a court, among other things. And the mild reason, I believe they had the multiple members, is because legislatures have multiple members, appellate courts have multiple members, the idea of the deliberation and recreating that. And when you divorce, and so when you say Humphrey's executor didn't say anything about it, I think it said a lot about it when it used the terms quasi-legislative and quasi-executive. And you go to the members of Congress, why did Senator Newlin's focus so heavily on, I want a multi-member agency, if it's single member, that has to be executive. It's because they were recreating this deliberative body. And that's gone when you just have one person. And they also were trying to get bipartisan bodies, and that's been the tradition as well. One person can't simultaneously be both parties most of the time. Actually, it's not bipartisan. It's not even bipartisan at the Federal Trade Commission. Federal Trade Commission says no more than three members of one political party. And, in fact, during the Reagan administration, when President Reagan had a vacancy and three Republicans already on the commission, he appointed an independent, and then his next appointment was someone who was described as a Reagan Democrat. So, in fact, it's not a matter of bipartisan commissions, and the Board of Governors of the Federal Reserve System has no partisanship qualifications. In fact, the geographic qualification members of the Board of Governors have to come from different Federal Reserve districts. When I asked Mr. Olson why this case wasn't controlled by Morrison, his answer was that the director, that there's more than just limitations on removal. I'm like the independent counsel. The statute removes from the president all authority over budget, appropriations, communications with Congress. There's all these other aspects of the structure of the Bureau that, when combined with the removal power, distinguish it from Morrison and make it unconstitutional. What's your answer? Your Honor, with respect to the funding, the Bureau is funded much like other financial regulatory agencies, much like two-thirds of the government, outside the annual appropriations process. But those other agencies don't have full removal restrictions. This one does. No, they do, Your Honor. Well, go ahead then. They do. And, in fact, the Public Company Accounting Oversight Board in free enterprise was funded outside of the annual appropriations process. That puts no restriction whatsoever on the president. The president is always free in his budget to propose anything he wants to with respect to the Bureau. And, in fact, it puts no restriction on Congress either, because Congress, as the panel in this case recognized, Congress is free at any time to change the source of the Bureau's funding or even to eliminate the Bureau's funding altogether. His point was that maybe each of these individually isn't enough, but when you combine them all, the restriction on removal, the five-year term, which means the president might not be able to appoint someone at all, and all the budget limitations, any other restrictions, if those all add up to establishing this case, I'm not asking you about the merits. I'm just asking you the question about whether or not Morrison controls this case and why Mr. Olson's answer isn't a pretty good reason why it doesn't. Because when you add all of these up, all the differences from Olson, it's a different institution, which is with a greater threat to the ability of the president to execute the laws. That's his argument. Morrison does control this case, Your Honor, and if you look at each of those other restrictions, none of them restricts it to go through one by one, but none of them restricts the president whatsoever. The fact that when we went through the budgeting authority and with respect to whether certain committees in Congress can oversee the Bureau's budget, that has no effect on the president's authority. What the court held in Morrison is that if the president can remove an official at least for cause, the president has sufficient authority. Now, PHS has also made some arguments that the Bureau is somehow more powerful than the Federal Trade Commission was in 1935. I would draw this court's attention to this court's decision in National Petroleum Refiners versus FTC. It's cited in PHH's reply brief at page 6. The case is at, I believe it's at 483 Fed 2nd, 672. The issue in that case is whether the Federal Trade Commission had the authority to issue substantive rules, and substantive rules is one of PHH's methods. They say Federal Trade Commission couldn't issue rules in 1935, but the Bureau issues substantive rules. What this court held, and this court was asked to consider whether the Federal Trade Commission, based upon basically the original FTC statute as it was enacted in 1914, whether the Federal Trade Commission had rulemaking authority. Ultimately, this court in 1973 concluded that it did, but before reaching that conclusion, this court observed that, and to use this court's words, it was but a quibble to distinguish the pervasiveness of the FTC's authority, even assuming it didn't have rulemaking authority. It was but a quibble to distinguish the pervasiveness of that authority from that of other regulatory agencies that could engage in substantive rulemaking, and the court also noted there on the same page, I think it's at page 685, the court noted that the Federal Trade Commission, based solely on its authority to pursue administrative adjudication resulting in cease and desist orders, based solely on that authority, the Federal Trade Commission exerted what this court referred to as a powerfully regulatory effect over business practices subject to its authority, and note that in 1935, and still today, the Federal Trade Commission has authority over virtually the entire economy, whereas the Bureau has authority over consumer financial product groups. Let me ask you a back and forth question, and something Judge Millett mentioned earlier. Yes, Your Honor. In response to the Bougry's point about taking all these things together, your response in part is, well, Congress could always change the statute, and I appreciate that. You say, you know, the President isn't limited in the appropriations process, but he is. All right, there's an independent source of funding. So is part of the response here that it is true there's an accumulation here, but Congress put this Bureau or made it part of the Federal Reserve System, and that system in itself is unique in a number of different ways. So while we can compare the powers of individual agencies, look at the powers of the central bank concept and the power of the Federal Reserve. In that area, I mean, so far, it's been different. So the combination doesn't have necessarily the same impact on comparing the President's power that it might outside of the Federal Reserve System. Or is that a flawed analysis as well? I think, Your Honor, my answer would be that it's not that Congress can change these provisions. It is that these other provisions that they point to have no impact whatsoever on the power of Congress or on the power of the President, so they have no impact on the separation of powers issue. You just reject the combination argument. I do, because each of those things analyzed separately. That's not my point. Separates them out, but viewed in their totality, it's just too much. And so the response I'm trying to get from you is whether because it's part of the Federal Reserve System, that is sort of an exception that historically has been recognized in our governmental system. No, I don't think I would say that, Your Honor. What I would say is that the way the combination issue is resolved is that each of the things separately is a zero with respect to the for-cause removal argument. So when you add them all together, you're adding zero plus zero plus zero plus zero. And at the end of the day, when you add all those zeros together, you're still there with zero. And the for-cause removal provision, the Supreme Court has explained, and Humphrey's executor and Morrison versus Olson, that that does not unduly impinge on the President's authority to take care that the laws be faithfully executed. I wanted to ask you a question a little off the constitutional subject, because it's a subject that's argued back and forth in the brief. Is it still the jurist's position that no statute of limitations applies to it, that you can bring cases such as this 10 years, 20 years, 30 years after the cause of action accrued? No, Your Honor, and I think we had some discussion about this during the panel discussion, and we have not fully briefed that out. We've discussed this a little more now. Their argument is that with respect to RESPA, RESPA's three-year statute of limitations applies. Now, if you look in the statutory addendum that PHH applies to it. Your position not only applies to actions in court, but I'm asking you for the administrative proceedings. Is it still the jurist's position that no statute of limitation applies? Yes, there is a statute of limitation. It's the statute of limitation in the judicial code 28 U.S.C. 2462. Yep. Does that apply in this case? It applies, but it has no effect, because the Bureau did not challenge any conduct. That's a five-year statute of limitation. The Bureau did not challenge any conduct that occurred more than five years before the tolling agreement that PHH applied in. No, no, no. The reason I raise that is there is a case pending in the Supreme Court involving that very statute, and the question is whether it applies to discouragement cases, and this is a discouragement case. That's right, Your Honor. So you're taking the position that it does apply? No, I'm sorry. So your position is there's no statute of limitation? No. The statute, the five-year statute of limitations applies, and with respect to other injunctive relief, if the Bureau is seeking, the Bureau is seeking discouragement, if the Supreme Court determines in the Kokesh case that discouragement is, discouragement particularly that goes to the Treasury, is covered by the statute of limitations in the judicial code, that would apply, although we're within the five-year statute of limitations. With respect to... Keep going. Keep going. With respect to other equitable relief we might seek, such as an injunction or perhaps consumer redress, that's equitable relief, and equitable provisions would apply. If the Bureau attempted to challenge conduct that occurred 20 years ago and had ceased 20 years ago, equitable provisions would limit the Bureau's authority. But if the conduct is ongoing or likely to recur, and there was a finding here in the Director's decision that PHH's conduct was likely to recur, the Bureau is entitled to get injunctive relief for that. Mr. Fenneman, there's also a notice issue in the statutory part of this case. What is your position that the PHH was on notice that this kind of captive reinsurance was unlawful? They base that argument primarily on this 1997 letter. I'm asking you really a slightly different question, which is what is the affirmative source? And if I'm an actor in this market and I'm trying to figure out can I do this, what would be your reading of what would say to me no? What would say you no? Yes. The statute, Your Honor. The statute itself, Section 8A of RESPA, and it's in that statutory addendum that PHH provided. It's on page 3. If you look in the left-hand column at the bottom, Section 8A of 12 U.S.C. 2607A, it says that no person shall give, no person shall accept a fee, kickback, or thing of value for referrals of real estate settlements. And then they point to 8C2. They point to 8C2. Section 8C2 says that nothing in this section, Section 8, shall be construed as prohibiting the payment to any person of a bona fide salary compensation or other payment for, among other things, services actually performed here. So there are two requirements there. They could read that from the statute. Services actually performed means that you can't have a huge payment for token services. The price paid must be commensurate with the value of the services. And then there's another requirement, and that requirement is bona fide. What does bona fide mean? It means in good faith. And if the Supreme Court explained in McDonald v. Thompson, we discussed that in our brief at page 38 of our red brief before this court, what the Supreme Court explained was that in a remedial statute like this one, bona fide means, in good faith, not for purposes of evasion. But that's exactly what PHH was doing when it set up its reinsurance operation. Can I ask another question on your 0 plus 0 plus 0, which I was intrigued by? So if the SEC, if Congress decides to combine the SEC and the FTC and the CFPB into one single agency, for example, 0 plus 0 plus 0 plus 0, that's fine as an independent agency? No, the issue there, again, with respect to each agency is what functions the agency performs. And note that during the Humphreys executor case, while that case was moving forward, Congress, in fact, assigned regulation of securities to the Federal Trade Commission for a period of time. That may have been one of the reasons that Roosevelt wanted to get rid of Humphreys. If you had an answer, that would be okay. I didn't get that. No, you'd have to look at the functions of the agency. The functions of an agency that combined what the FTC does, what the SEC does, and what other agencies do all combined together would be very different. So you'd have to look at the functions that the agency performs. But here, the Bureau performs functions that are remarkably similar to what the Federal Trade Commission does. And so this board need go no further than Humphreys executor and Morrison versus Olson. And those cases decide this case. All those zeros were added to a discussion about for-cause removal. And you were arguing, or at least perhaps you were just relying on precedent that says there's no problem with for-cause removal, right? That does not diminish the President's ability to hold officials accountable. Can you give me any example where an agency had been actually successfully removed for-cause? I cannot, Your Honor. It's my understanding, I cannot, but my understanding is that what happens in a situation like that is that when the President begins to pursue for-cause removal, the official simply resigns. And that's not what happened to Humphrey. I beg your pardon? That didn't happen to Humphrey. Humphrey actually did leave the agency, and what he was trying to do- Not when he got the letter from President Roosevelt he didn't leave. I asked you to be, you know, to part your office. He didn't leave. And he did, and so what happened in this case was he was suing for back pay. He was gone. I ask this question because there was a letter that was reportedly sent to President-elect Trump and from some Congress people who said, since the founding of our Republic, no President has ever removed an independent agency head for cause, and warning him that for-cause removal is an extraordinary remedy whose use must be subjected to enhanced congressional, judicial, and public scrutiny. Now, I don't know if they were right about that, but it seems to me if for-cause removal is, in effect, something that is never used successfully, arguably it does diminish presidential authority. Your Honor, the issue is not diminution of presidential authority. It's whether the President retains sufficient authority to make sure that the laws are faithfully executed. However you want to say it, if you can't remove them, then it has some effect. I note that those congressmen may have said that it's something that can't, that the President can't use, but I would note that- You said, I think in response to my question, Humphrey leaving soon thereafter, that actually they do have to leave if a President removes you for-cause, regardless of whether you disagree, and you're only entitled to back pay, not an injunction. Is that your position? The President didn't remove Humphrey for cause. He removed Humphrey because he said- Put aside Humphrey. But is your position that if you're removed for cause, you can get an injunction or only can get back pay? I don't know, Your Honor, what procedures could apply. I think some agencies specify certain procedures- That's Judge Brown's point. I think it's not happened, right? It has not happened. I don't know that it has happened. However, I would note that the panel's decision cites the Cushman volume on independent regulatory agencies, and Cushman, at least, when he was doing his analysis of independent regulatory agencies, thought that for cause removal did amount to something. I believe it's at pages 644 and 645 of his- Amounted to some kind of, I missed your word, amounted to some kind of- It's a not a nothing, Your Honor. It's a power that the President does have to make sure that officials are operating honestly, are operating competently, and so on. I agree, Judge Brown. However, I am aware of no instance where a President has actually exercised that power. It seems, you know, I'm trying to figure out how this cuts as a follow-up on Judge Brown's question because I thought about this, and I've seen a lot of your articles and other commentary that say that even though there is the for cause protection under Humphrey's executor, basically the only remedy that's available is back pay, and they're saying that there's never been a case where a court has enjoined a President, and lots of commentators believe that no court would have jurisdiction to enjoin a President. So how does that cut in our analysis? Does that mean that really this is kind of a toothless protection, or does that mean that how does it cut? How should we think about that? I don't think it's toothless. I think that with respect to the analysis of the separation of powers issue, the court has held that as long as the President can remove an official at least for cause, he can assure that that official is performing his or her duties in a manner in accordance with the statute. He may not be able to remove the official simply for policy disagreements. That's what... Didn't the majority opinion in Morrison say that? The majority opinion in Morrison relied on the President's ability to remove for cause as a meaningful authority on the President. Yes, Your Honor, yes it did. And I think that both Humphrey's executor and I believe also Morrison indicated that he cannot... The one thing that the court has decided is that you can't remove them just for... Is policy disagreement cause? Well, Your Honor, I think that that was what happened in Humphrey's executor, and the court said no there. I think that... I don't know if that letter said something like I would like to have a man there who is... He's eye to eye with me, I think, is what he said. I just want to reaffirm that understanding, I believe. I believe that's correct. My point is that even though that's what the court held in Humphrey's executor, now it was Humphrey's executor because Humphrey died, but let's suppose he was still alive when the court made this decision. He wasn't going to get his job back. I mean, so I guess what I'm saying is as long as the President is willing to cut a check for pay for the rest of the term, even if a court disagrees with him later, he can still get rid of the person, even with the Humphrey's executor protection, right? That may be, Your Honor. I just don't know how that would play out were that to ever happen, and, of course, that's not the issue here because here we're just looking not at a situation as applied, but just at the statute on its face. Are there any more questions? Your Honor, how much time does Mr. Olson have? Two minutes and 45 seconds. Okay. Two minutes and 45 seconds. There has never been an agency like this. The zero plus zero plus zero, all of those things that Congress carefully put in the statute to ensure the independence of this agency are not zeros. They are significant in each and every respect, and the sum total of that request of authority to this agency creates the most powerful agency. This agency is given the power to enforce 19 separate consumer financial statutes that come from all different agencies when this act was created. This is a very powerful agency. Now, does the President, under free enterprise fund, have the authority to be accountable to how those decisions with respect to those 19 statutes are made? The President has none. To use the words of the panel decision in this court and the Supreme Court in free enterprise fund, the buck stops somewhere else. The President can say, I can't do anything about that. Unless he steals money or does something like that, I cannot remove him. Now, we start with the proposition that what this agency is doing is performing executive functions. There's no question about it. Very broad executive functions. There is no stopping point. It could be the Treasury Department. It could be the Environmental Protection Agency. It could be any other agency of the federal government, and we could have the same arguments that we're having here. In fact, it already is part of HUD. Part of HUD was taken and given to this agency and a bunch of other agencies, too. And what the Supreme Court said in Stern v. Marshall said that illegitimate and unconstitutional practices get their first footing by silent approaches and slight deviations from the legal modes of procedure. That's what the Supreme Court said. Now, I submit this is neither silent nor slight. As Justice Scalia would have said, you're anticipating what I'm about to say, this wolf comes as a wolf. The principle that the CFPB advances would allow the entire executive branch to be swallowed up by, quote, independent agencies. Congress will do this. What was said in the Federalist Papers about the impetuous vortex, Congress will do this all the time. These are all great arguments against Humphrey's executor. Yes. Yes, and so Free Enterprise Fund looked at Humphrey's executor, looked at the context of Humphrey's executor, said this is going to be a body of experts exercising quasi-judicial and quasi-legislative functions, and it had at that time in 1935. To be clear, they said that they would acquire the expertise during their tenure. They didn't have to be chosen based on expertise. I didn't quite hear that question. They don't get hired based on expertise. It was that the rationale the Supreme Court said is that they would acquire expertise because of length of tenure. But my quick question to you is just to be clear, putting aside your objections to Humphrey's executor, which you have definitely reserved and you also agree we can't decide. So if we assume Humphrey's executor remains good law, would the CFPB, would you still have a constitutional argument if it were headed by two or three people instead of one? We're accepting the outcome of Humphrey's executor. This agency goes vastly further than that. If it were headed by two or three, would you still say to me? If it were headed by a multi-member. In my judgment, it makes no difference. The fact is I do agree with the panel decision that when you disperse the power to several different individuals, stagger the terms, it has effects that limit the authority of any individual. This is different. I would go further, as you can tell from our voice, much further than what the panel decision was willing to do. Because of all of these other authorities, severing just the removal provision does not take out all these zeros, which are not zeros, that are given to the agency. There is no doubt that this is executive functions. The founders of that country in 1787, 1788, 1789 made the same decision over and over again. We will not have a plural executive. What we have in the CFPB is a plurality of the executive, and there is no stopping point. Now, I understand that we're bound, as we stand here today, by Humphrey's executor and Morrison versus Olson. But when the Supreme Court analyzed that in Free Enterprise Fund, it made it very clear. Those issues aren't before us because we weren't asked to do it, but it was very skeptical about those intrusions into the executive authority because there's no stopping point. And the Supreme Court instructed that that is as far as it's going to go. And our submission is that this agency, this director, this individual who can hire and fire at will, there's no Senate participation in the officers beneath him. He has authority that is in no other agency, hire and fire people, and tell them basically whatever he wants to do. He doesn't have to communicate with the White House with respect to pending legislation. He can bring enforcement actions without checking with anybody. He has broad litigation authority. Now, each of one of those things, if you could try to unpack those, I understand why my opponent would like to take them one at a time and say it's no big deal. No big deal. And each of those things are a big deal. But when you put them all together, it is a very big deal, and there is no stopping point. And this Court, I submit, is bound by the limitations prescribed in Free Enterprise Fund. Don't go any further unless you can fit it within the narrow confines of Humphrey's executor and Morrison, which is an inferior officer. It is nothing like what we have here today. So we submit that this agency is manifestly unconstitutional, squarely inconsistent with Article 2 of the Constitution. I have to say one more thing, is that because there are very, very important interpretations of the statute that were articulated in the panel opinion, which are basically not challenged here. I heard a little bit about that, but not very much. It's very, very important that whatever happens, that the decisions on those issues be reinstated, and the issue that was mentioned in footnote 30 on page 100 be resolved as well, if that's possible. Because those decisions with respect to the statute that were manifestly incorrect, not a close case according to what the unanimous part of the panel decision said, need to be reinstated because they're very important to an industry. People have to understand what the rule of law is. But at the bottom, those violations of statutes, those violations of due process requirements, those eliminations of the statute of limitations, all the other errors that were made that are articulated in that panel opinion, are the product of an unconstitutional agency. When you create those kind of agencies, this is what happens. Because no one is accountable for them, and that has to change. Thank you. Stand, please. This honorable court now stands adjourned until September 7th at 9.30 a.m.
judges: Henderson, Henderson, Rogers, Tatel, Brown, Griffith, Kavanaugh, Kavanaugh, Srinivasan, Millett, Pillard, Wilkins, Randolph, Randolph